## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WESTERN WOOD PRESERVERS
INSTITUTE, *et al.*,

                  *Plaintiffs*,

    v.

JOHN M. McHUGH, Secretary
of the Army, *et al.*,

                  *Defendant*.

Civil Action No. 12-1253 (ESH)

## MEMORANDUM OPINION

Plaintiffs Western Wood Preservers Institute, Treated Wood Council, Southern Pressure
Treaters' Association, Creosote Council, and Railway Tie Association ("plaintiffs") have sued
John M. McHugh in his official capacity as the Secretary of the Army, the United States Army
Corps of Engineers, and Rebecca Blank in her official capacity as Acting Secretary of
Commerce ("defendants" or "Corps"). Plaintiffs challenge the Corps' approval of two regional
conditions to nationwide permits under the Clean Water Act, as well as the issuance of certain
operating procedures for activities that are regulated by that Act. Before the Court is defendants'
motion to dismiss plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and
12(b)(6). (Oct. 22, 2012 [ECF No. 15-1] ("Mot.").)

## FACTUAL BACKGROUND

### I.    REGIONAL CONDITIONS

The Clean Water Act, 33 U.S.C. §§ 1251-1387, prohibits the discharge of any pollutant
into navigable waters unless authorized by an individual or general permit issued by the Army

Corps of Engineers.  *See id.* §§ 1311(a), 1344(a), (e).  The issuance of an individual permit

requires a case-by-case analysis.  *See id.* § 1344(a).  In contrast, general permits may be issued

on a state, regional, or nationwide basis for categories of activities that "will cause only minimal

adverse environmental effects when performed separately, and will have only minimal

cumulative adverse effect on the environment."  *Id.* § 1344(e)(1); 33 C.F.R. § 322.2(f)(1).  Any

party may engage in an activity within the scope of a general permit.  Nationwide general

permits may be conditioned or restricted by District and Division Engineers within the Corps,

resulting in what are known as regional conditions.  33 C.F.R. § 330.1(d).

On February 16, 2011, the Corps proposed to re-issue 48 existing nationwide permits and

two new nationwide permits for the five-year period from 2012 through 2017.  (*See* Mot. at 7

(citing 76 Fed. Reg. 9174-01, 9175); Second Amended Complaint, Oct. 3, 2012 [ECF. No. 13]

("Compl.") ¶ 15.)  Two district offices of the Corps then announced proposed regional conditions

for those nationwide permits: (1) on February 25, 2011, the Portland District proposed a regional

condition that would prohibit nationwide permittees from using "wood products treated with

biologically harmful leachable chemical components," including various wood preservatives, "to

come in contact with waters or wetlands" in the State of Oregon (Compl. ¶ 16); and (2) on March

4, 2011, the Alaska District proposed a regional condition that would prohibit nationwide

permittees from using products treated with creosote and pentachlorophenol in certain waters in

Alaska (Compl. ¶ 17) (collectively, "the Regional Conditions").  The nationwide permits were

published on February 21, 2012.  (Compl. ¶ 18 (citing 77 Fed. Reg. 10184).)  The Oregon

Regional Condition was approved on March 16, 2012 (Compl. ¶ 19), and the Alaska Regional

Condition was approved on March 19, 2012 (Compl. ¶ 20).

Plaintiffs allege that the Regional Conditions were issued in violation of mandatory procedural requirements under the Administrative Procedures Act (Claims 1-3, 8, and 9), Army Corps regulations (Claim 4), the National Environmental Policy Act (Claim 5), the Endangered Species Act (Claim 6), and the Regulatory Flexibility Act (Claim 7).  (Compl. ¶¶ 26-72.)

II.    **SLOPES PROCEDURES**

The Endangered Species Act, 16 U.S.C. § 1531-1544 ("ESA"), provides certain protections for species listed as "threatened" or "endangered."  *Id.* § 1533(a).  Relevant to this case, the Act provides that federal agencies must ensure that any proposed agency action will not "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [that species' critical habitat]."  *Id.* § 1536(a)(2).  The determination of what constitutes a "critical habitat" is to be made by the Secretary of the Interior or the Secretary of Commerce, who have delegated that responsibility to the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS"), respectively.  *Id.* § 1532(15).  Thus, federal agencies must consult with the FWS or NMFS whenever an agency action "may affect" an endangered or threatened species.  50 C.F.R. § 402.14(a).  Formal consultation with those entities results in their issuance of a "biological opinion," assessing whether the species or its habitat is likely to be jeopardized, and if so, identifying any "reasonable and prudent alternatives" that may exist to avoid that jeopardy.  50 C.F.R. § 402.14(h)(3).

In order to streamline the ESA consultation process, the Corps has adopted several Standard Local Operating Procedures for Endangered Species, known as "SLOPES" procedures, for certain recurring activities.  Each of these procedures set out design criteria for categories of recurring activities.  The Corps then consults with the NMFS to receive a biological opinion on

whether the use of those design criteria would jeopardize the existence or critical habitats of any threatened or endangered species. (Compl. ¶ 21.) If the NMFS agrees that a set of SLOPES procedures complies with the ESA, then the Corps may issue permits for any proposed project that complies with those design criteria without seeking further consultation from the NMFS.

On November 2, 2011, the Corps consulted with NMFS on a new set of procedures, known as SLOPES IV, which addressed construction or maintenance of certain in-water and over-water structures in Oregon. (Compl. ¶¶ 21-22; Mot. Ex. A.) One of the design criteria in SLOPES IV provided that treated wood could not be used as part of an in-water or over-water structure. (Compl. ¶ 23.) On April 5, 2012, the NMFS issued a biological opinion that those design criteria would not jeopardize any endangered or threatened species or their critical habitats, and therefore projects that satisfy those design criteria would comply with the ESA. (Compl. ¶ 22; Mot. Ex. B.) If, however, a proposed project did not comply with the design criteria in the SLOPES IV procedures, that would not prevent the issuance of a permit for that project, the Corps would simply need to request additional consultation from the NMFS.

Plaintiffs allege that the SLOPES IV procedures were issued in violation of mandatory procedural requirements under the Administrative Procedures Act and the ESA (Claim 10), the National Environmental Policy Act (Claim 11), and the Regulatory Flexibility Act (Claim 12). (Compl. ¶¶ 73-84.)

## ANALYSIS

Defendants have filed a motion to dismiss plaintiffs' complaint, arguing that plaintiffs lacked constitutional standing to bring any of their claims, that they lacked prudential standing to bring certain of their claims, and that certain of their claims should be dismissed for failure to state a claim.

I.      **ARTICLE III STANDING**

To establish constitutional standing, plaintiffs must demonstrate (1) that they have suffered an injury-in-fact, (2) that the injury is fairly traceable to the defendant's challenged conduct, and (3) that the injury is likely to be redressed by a favorable decision.  *See NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Plaintiffs bear the burden of establishing each element of standing.  *Lujan*, 504 U.S. at 561.  However, on a motion to dismiss, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Ord v. Dist. of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Plaintiffs are trade associations representing manufacturers, distributors and suppliers of treated wood throughout the United States.  (Compl. ¶ 1.)  They have filed suit both on their own behalf and on behalf of their individual members.

A.      **Associational Standing**

Plaintiffs allege that their members have suffered two types of injury-in-fact.  First, that as a result of the challenged regulations, they have suffered lost sales because builders in Oregon and Alaska prefer to use materials other than treated wood so that they can take advantage of the Regional Conditions and the SLOPES IV procedures.   (Plaintiffs' Opposition to Defendants' Motion to Dismiss, Nov. 8, 2012 [ECF No. 16] ("Opp'n") at 12-13.)  Second, plaintiffs argue that their members suffered procedural injuries when the Corps failed to comply with APA rulemaking obligations in issuing the challenged regulations. (Opp'n at 13.)

To sue on behalf of its members, a trade association must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *accord Am. Library Ass'n v. Fed. Commc'ns Comm'n*, 401 F.3d 489, 492 (D.C. Cir. 2005).  Defendants concede that elements (b) and (c) are met, but dispute that plaintiffs have established that their members would otherwise have standing to sue in their own right.  (Mot. at 11-12.)  Specifically, defendants point to the fact that plaintiffs have not identified a single member firm that has suffered the injuries they allege, as required under Supreme Court precedent that "plaintiff-organizations [must] make specific allegations establishing that at least one identified member had suffered or would suffer harm."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see also Chamber of Commerce  v. E.P.A.*, 642 F.3d 192, 199-200 (D.C. Cir. 2011) ("[I]t is not enough to aver that unidentified members have been injured.  Rather, the petitioner must specifically identify members who have suffered the requisite harm." (internal quotation marks and citations omitted)).

Despite this clearly established requirement, plaintiffs have not identified any specific member who has suffered either of these alleged harms.  Instead, plaintiffs insist that by requesting such detail, defendants "seek to hold Plaintiffs to the more demanding evidentiary standard of a summary judgment motion."  (Opp'n at 1.)  To the contrary, the D.C. Circuit has explained that if standing is challenged, a petitioner "'should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding'—either 'in response to a motion to dismiss for want

of standing' or, in the absence of such a motion, 'with the petitioner's opening brief.'"

*Rainbow/PUSH Coal. v. Fed. Commc'ns Comm'n*, 396 F.3d 1235, 1239 (D.C. Cir. 2005)

(quoting *Sierra Club v. E.P.A.*, 292 F.3d 895, 900 (D.C. Cir. 2002)); *see also Common Cause v.*

*Biden*, 2012 WL 6628951, at *9 n. 6 (D.D.C. Dec. 21, 2012) (finding that plaintiffs had

conceded that they lacked associational standing by failing to respond to defendants' argument in

their motion to dismiss that plaintiffs had not specifically identified any of their members who

suffered the alleged harm).  Thus, because plaintiffs have not identified any specific member

firm to have suffered the alleged harm, they do not have standing to sue on behalf of their

members in a representational capacity.

### B.       Organizational Standing

Plaintiffs also bring suit on their own behalf as trade associations.  Defendants do not

appear to challenge the traceability or redressability of any injuries-in-fact plaintiffs may have

alleged on their own behalf, but they do challenge whether they have sufficiently alleged any

such injury.  Plaintiffs allege that they have suffered three types of injuries-in-fact:

environmental injury, informational injury, and procedural injury.

### 1.       Environmental Injury

Plaintiffs argue that they have suffered environmental injuries from the challenged

regulations.  Specifically, they claim that the challenged regulations bias the marketplace in

favor of competing materials (i.e., plastic, steel, and concrete) "that may have potential harmful

environmental impacts."  (Compl. ¶ 47.)  This, in turn, they claim "has injured the associations

and undermined the associations' environmental objectives."  (Opp'n at 15.)

Undoubtedly, injury-in-fact can be based on non-economic harms, including harms to

environmental interests.  *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("We do not

question that [environmental] harm may amount to an 'injury-in-fact' sufficient to lay the basis

for standing under . . . the APA.") However, "the 'injury-in-fact' test requires more than an

injury to a cognizable interest. It requires that the party seeking review be himself among the

injured." *Id.* at 734-35. Thus, the "[s]tanding analysis does not examine whether the

environment in general has suffered an injury." *Ctr. for Biological Diversity v. U.S. Dep't of

Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009). Instead, a plaintiff must establish that he will

suffer the effects of the environmental injury in a "personal and individual way." *Id.* For

example, the Supreme Court has explained that although "one living adjacent to the site for

proposed construction of a federally licensed dam has standing to challenge the licensing

agency's failure to prepare an environmental impact statement," there can be no standing "for

persons who have no concrete interests affected—persons who live (and propose to live) at the

other end of the country from the dam." *Lujan*, 504 U.S. at 572 n. 7; *see also Sierra Club*, 405

U.S. at 735 (finding no standing where the alleged injury would be felt only by those who used

the particular national parks affected by the action and the plaintiff had failed to allege that either

it or its members actually used those parks for any purpose).

　　　　Like the plaintiffs in *Lujan*, plaintiffs here are not themselves located near the areas

affected by the challenged regulations. Indeed, none of the plaintiff organizations is based in

either Oregon or Alaska; they are in Washington State, the District of Columbia, Georgia,

Louisiana, and Pennsylvania. (Compl. ¶¶ 4-9.) Thus, plaintiffs have not shown that they would

suffer any possible environmental harm in a "personal and individual way." *Ctr. for Biological

Diversity*, 563 F.3d at 478.

　　　　Nor can plaintiffs rely on their purported organizational interests in using treated wood in

environmentally-responsible ways to establish injury. The Supreme Court has expressly noted

that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA," *Sierra Club*, 405 U.S. at 739. Thus, absent some showing of an environmental injury to plaintiffs themselves, plaintiffs have not established that they have suffered an injury-in-fact resulting from the potential environmental impact of the challenged regulations.

### 2. Informational Injury

Plaintiffs also assert that they have suffered an injury to their "informational interest in federal agency analysis and consideration of environmental and economic issues relating to treated wood." (Opp'n at 14.) This argument seems to be based on plaintiffs' belief that defendants violated several of the rulemaking requirements of the APA and other statutes and thereby deprived plaintiffs of information to which they were entitled, such as notice of proposed rules or certain environmental or economic analyses. (*See id.*)

Although both parties address plaintiffs' various standing arguments as though they apply with equal force to all of plaintiffs' claims, the Court notes that standing must be assessed on a claim-by-claim basis. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). In the Court's opinion, most of plaintiffs' claims are not even amenable to analysis based on informational injury-in-fact.

To the extent that plaintiffs' claims allege violations of APA and Corps rulemaking procedures, any injury suffered under those claims is more properly regarded as a procedural injury and is discussed below. *See infra* Section I.B.3. This applies to plaintiffs' claims 1-4, 8, 9, and the part of claim 10 that arises under the APA. (*See* Compl. ¶¶ 26-42, 58-78.) Similarly, claim 6 and part of claim 10 are based on alleged violations of the ESA's procedural

requirements and cannot be read to assert any informational injury.  (*See* Compl. ¶¶ 49-53, 73-78.)  Finally, neither the parties nor the Court has identified any case that would recognize a claim (such as plaintiffs' claims 7 and 12) under the Regulatory Flexibility Act based on an informational injury-in-fact, rather than a procedural injury.  Thus, the only claims that could arguably be premised on an informational injury are claims 5 and 11, which challenge the Corps' failure to prepare an environmental impact statement for the Regional Conditions or SLOPES IV procedures, respectively.  (Compl. ¶¶ 43-48, 79-81.)

For purposes of informational standing, "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998); *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011).  Under plaintiffs' view of the law, both the Regional Conditions and the SLOPES IV procedures are final agency actions, such that the Corps was required under the National Environmental Policy Act ("NEPA") to prepare an environmental assessment (EA) or environmental impact statement (EIS) analyzing the impact of that action.  (*See* Compl. ¶¶ 43-48, 79-81.)  Thus, because the Corps did not prepare an EA or an EIS, plaintiffs argue they were deprived of access to information that was required to be publicly disclosed and have suffered an informational injury.

An informational injury, like any other injury-in-fact, must be concrete and particularized, rather than "generalized."  *Akins*, 524 U.S. at 23.  "Allegations of injury to an organization's ability to disseminate information may be deemed sufficiently particular for standing purposes where that information is essential to the injured organization's activities, and where the lack of the information will render those activities infeasible."  *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 122 (D.C. Cir. 1990).  While there is

10

a substantial question as to whether plaintiffs' sparse allegations on this point are sufficient to establish that the information that would have been contained in an EIS is essential to their activities,[1] the Court need not resolve this issue because it concludes that plaintiffs do not have prudential standing to sue under NEPA.  *See infra* Section II.

### 3.    Procedural Injury

Plaintiffs argue that they, like their members, have suffered procedural injuries by not being permitted to participate in the rulemaking process that they argue is required by the APA. (Opp'n at 13.)

A plaintiff may establish standing based on a procedural injury only if (1) the government violated a procedural right that was designed to protect their threatened concrete interest, and (2) the violation in fact resulted in injury to that concrete, particularized interest.  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005).

In this case, neither side has addressed, and the Court need not resolve, whether any of the statutes in question were designed to protect the interests of the plaintiff trade associations because the Court concludes that plaintiffs have not shown that they have suffered any injury to a concrete, particularized interest of theirs.  As discussed above, plaintiffs have not shown that they—the trade associations themselves—have suffered or will suffer any environmental injury. *See supra* at 7-9.  Moreover, even if plaintiffs could demonstrate an injury to their informational

---

[1] In their complaint, plaintiffs state that they engage in such activities as "address[ing] regulatory matters affecting [their] members," "monitor[ing] and respond[ing] to legislation and regulatory activities related to the treated wood industry," "advocat[ing] for environmentally sound standards for treated wood manufacture and use," and "promot[ing] the economical and environmentally sound use of treated wood crossties."  (Compl. ¶¶ 6-9.)  In their opposition, where they attempt to explain their alleged informational injury, plaintiffs do little more than state that they have an interest in "federal agency analysis and consideration of environmental and economic issues relating to treated wood," and that such information is needed "to perform their core representational and advocacy functions on behalf of the treated wood industry." (Opp'n at 14.)

interests as relates to claims 5 and 11, the Court has determined that they do not have prudential standing to raise those claims, and thus, it need not decide whether they have also suffered an injury to their procedural rights under those claims.

## II.    PRUDENTIAL STANDING

The standing requirement encompasses "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth*, 422 U.S. at 498.  Even if a plaintiff establishes Article III standing, a court must determine whether there are any prudential reasons to decline to exercise its jurisdiction.  For example, section 702 of the APA requires that a complainant be "adversely affected or aggrieved . . . within the meaning of a relevant statute." 5 U.S.C. § 702.  This requirement has been interpreted to mean that the interest a plaintiff asserts must be within the "zone of interests" that is intended to be protected by the statute on which the claim is based.  *Ass'n of Data Processing Serv. Orgs. Inc. v. Camp*, 397 U.S. 150, 153 (1975).

Under the law of this Circuit, prudential standing requires a plaintiff to demonstrate either (1) that it is an intended beneficiary of the statute that forms the basis of its claim, or (2) that it is a "suitable challenger" to enforce the statute, meaning that its "interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives." *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*, 87 F.3d 1356, 1359 (D.C. Cir. 1996) (internal quotation marks and citation omitted).

Defendants argue that claims 5 and 11 must be dismissed because plaintiffs lack prudential standing to file suit under NEPA.  (Mot. at 21-24.)  As the Supreme Court has noted, NEPA's zone of interests extends to "protecting the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983).  Thus, this Circuit has consistently

required that in order to bring suit under NEPA, a plaintiff must allege an "environmental harm." *See, e.g.*, *California Forestry Ass'n v. Thomas*, 936 F. Supp. 13, 21 (D.D.C. 1996) (citing *Competitive Enter. Inst.*, 901 F.2d at 124).  For example, in *ANR Pipeline Co. v. Fed. Energy Regulatory Comm'n*, 205 F.3d 403 (D.C. Cir. 2000), the D.C. Circuit held that the plaintiff did not have prudential standing to sue under NEPA because it "ha[d] not alleged that it will suffer any environmental injury as a result of the Commission's action."  *Id.* at 408; *see also Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 712 (D.C. Cir. 1988) (holding that "affiants voicing environmental concerns" could bring suit for failure to prepare an EIS under NEPA).

   As discussed above, plaintiffs here have not successfully alleged any environmental harm.  Even if they could establish that the environment would likely be harmed by the use of products other than treated wood, plaintiff organizations themselves are not at risk of harm from any such environmental impacts because they are not located anywhere near the waters affected by the challenged regulations.  *See supra* Section I.B.1.  Nor are plaintiffs' general allegations (Compl. ¶¶ 45-46) that the environment may be harmed by the use of products other than treated wood sufficient to bring them within NEPA's zone of interests.  To sue under NEPA, a plaintiff's interests must be "systematically, not fortuitously" aligned "with the interests of those whom Congress intended to protect."  *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924 (D.C. Cir. 1989) ("*HWTC IV*").  Plaintiffs' ultimate interest is in promoting the use of treated wood products by preventing the implementation of regulations that they believe encourage the use of competitor products.  (*See* Compl. ¶ 25 (alleging that "treated wood producers, distributors and resellers have lost sales to parties in Oregon [and Alaska] who would have preferred to use treated wood for their projects in or over the waters and wetlands of

Oregon but were forced to use alternative materials to take advantage of the nationwide general

permits and the programmatic biological opinion").)

This case therefore falls squarely within this Circuit's holding in *HWTC IV*.  There, an

organization of hazardous waste treatment companies sought stricter environmental regulations.

The Court noted that although their "immediate interest is in more stringent treatment standards,"

the "ultimate interest of those firms is in making money."  885 F.2d at 924.  Specifically,

"generators of hazardous waste would have greater need to treat their wastes prior to disposal,

and the member treatment firms would gain economically by providing the required treatment."

*Id.* at 924.  The Court declined to find prudential standing, noting that "judicial intervention may

defeat statutory goals if it proceeds at the behest of interests that coincide only accidentally with

those goals."  *Id.* at 925 (citing *Hazardous Waste Treatment Council v. E.P.A.*, 861 F.2d 277,

283 (D.C. Cir. 1988)).

As in *HWTC IV*, plaintiffs' attempt to articulate concern for the environment is "no more

than an economic injury in disguise."  *Trinity Cnty. Concerned Citizens v. Babbitt*, 1993 WL

650393, at *6 (D.D.C. Sept. 20, 1993).  Plaintiffs are interested in attacking regulations that

arguably may discourage the use of the building material with the greatest profit potential for

their members—treated wood.  Although that interest may "fortuitously" be aligned with

environmental concerns associated with the use of alternatives to treated wood, that is

insufficient to establish prudential standing.  *HWTC IV*, 885 F.2d at 924-25; *see also Thomas*,

936 F. Supp. at 22 ("While Plaintiffs also assert that the Interim Guidelines will adversely affect

forest health, . . . their alleged concern for the health of the forest is no more credible than the

waste treatment companies' concern for protecting health and the environment alleged in *HWTC IV*."). Thus, plaintiffs do not have standing to bring claims 5 and 11 under NEPA.[2]

## III.   REGULATORY FLEXIBILITY ACT

Plaintiffs' claims 7 and 12 allege that the Corps violated the mandatory procedures of the Regulatory Flexibility Act ("RFA") in adopting the Regional Conditions and SLOPES IV procedures, respectively.  (*See* Compl. ¶¶ 54-57, 82-84.)  Specifically, plaintiffs challenge the Corps' failure to prepare either an initial regulatory flexibility analysis under 5 U.S.C. § 603 or a final regulatory flexibility analysis under 5 U.S.C. § 604 without certifying that no such analysis was necessary, as required by 5 U.S.C. § 605.  (*Id.*)

As discussed above, the Court does not believe that plaintiffs have adequately alleged any injury-in-fact sufficient to confer Article III standing for those claims.  *See supra* Section I. However, even if plaintiffs had established injury-in-fact, the Court concludes that they would not have standing to bring a claim under the RFA because they do not meet the requirements of the RFA's judicial review provision, set forth in section 611.  Additionally, plaintiffs have not alleged facts sufficient to state a claim under the RFA.

Judicial review under the RFA is governed exclusively by section 611.  *See* 5 U.S.C. § 611(c) ("Compliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review only in accordance with this section.").  Section 611(a) identifies the specific sections of the Act that are subject to judicial review, and it does not include section

---

[2] Defendants also argue that plaintiffs do not have prudential standing to sue under the Clean Water Act, and thus, claims 1-4, 8, and 9 must be dismissed.  (Mot. at 19-21.)  As discussed above, the Court does not believe that plaintiffs have adequately alleged any injury-in-fact sufficient to confer Article III standing for any of those claims.  *See supra* Section I.  Moreover, although it may well be true that plaintiffs lack prudential standing under the CWA, that is irrelevant here, where it does not appear that plaintiffs' claims arise under the CWA.  Instead, the claims challenged by defendant arise directly under the APA and allege violations of its rulemaking provisions.

603.  *Id.* § 611(a).  Thus, the Court cannot review the agency's compliance with section 603.  *See Allied Local & Reg'l Mfrs. Caucus v. E.P.A.*, 215 F.3d 61, 79 (D.C. Cir. 2000) (finding that because section 611(a) does not include section 603 on the list of sections subject to judicial review, the court "may not review EPA's handling of these issues in terms of the agency's compliance with the RFA").

Additionally, with respect to sections 604 and 605, only "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance" with those sections.  5 U.S.C. § 611(a).  Plaintiffs have not alleged that they themselves are small entities covered by the RFA.  Thus, they have not demonstrated that they have standing to bring suit under that statute on their own behalf.  *See Nw. Mining Ass'n v. Babbit*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) (upholding plaintiff's standing under RFA based on uncontested assertion that plaintiff met the definition of "small entity" in the RFA).[3]

Finally, defendants argue that plaintiffs fail to state a claim under the RFA because that statute only requires an agency to consider the effect of a proposed action on entities that will be directly regulated by the action, which neither plaintiffs nor their members will be.  (Mot. at 25-26.)  The Court agrees.  This Circuit has held that the RFA only requires an agency to consider the economic impact of a proposed regulation on "regulated small entities."  *Mid-Tex Elec. Coop., Inc. v. Fed. Energy Regulatory Comm'n*, 773 F.2d 327, 342 (D.C. Cir. 1985).  That includes only "'small entities *which will be subject to the proposed regulation*,'—that is, those

---

[3] Plaintiffs do allege that "[t]he majority of members of the Plaintiff associations—hundreds of companies—are small businesses as defined by the Small Business Administration."  (Opp'n at 28.)  Thus, if plaintiffs had established that they had standing to sue on behalf of their members, and assuming that the definition of small business used by the Small Business Association corresponds to the definition used in the RFA, this would be enough to give plaintiffs standing to sue in a representational capacity under the RFA.  However, the complaint would still fail to state a claim under the RFA, as described below.  *See infra* at 16-17.

'small entities *to which the proposed rule will apply*.'"  *Cement Kiln Recycling Coal. v. E.P.A.*, 255 F.3d 855, 869 (D.C. Cir. 2001) (emphasis added) (quoting *Mid-Tex*, 773 F.2d at 342). Neither plaintiffs nor their members are subject to the proposed regulations contained in the Regional Conditions or the SLOPES IV procedures.  Instead, those regulations affect individuals seeking to comply with nationwide permitting requirements or to undertake in-water or over-water construction projects.  *See supra* at 1-4.  Plaintiffs and their members are only affected by the regulations indirectly, when those regulated entities make business decisions about which building materials to use in their projects.

*Aeronautical Repair Station Ass'n, Inc. v. Fed. Aviation Admin.*, 494 F.3d 161 (D.C. Cir. 2007), on which plaintiffs rely, is not to the contrary.  In that case, the Court held that contractors and subcontractors of an air carrier were "directly affected" by regulations that required drug and alcohol testing for all air carrier employees.  *Id.* at 177.  However, that case differed sharply from the facts of this case; there, although it was the air carriers themselves who were responsible for ensuring compliance with the rule, the regulation expressly required that the employees of contractors and subcontractors be tested, so there was little question that the contractors themselves were "subject to the proposed regulation," as required by *Mid-Tex*.  *Id.*  Here, the regulation says nothing about manufacturers of treated wood and imposes no obligations on them, much less on the trade associations that represent them.

Thus, because neither plaintiffs nor their members are properly considered "subject to the requirements of the rule," the Corps was not obligated to consider whether there would be "a significant economic impact" on them, and even if one were to assume the facts alleged by plaintiffs to be true, they have not stated a claim for which relief may be granted under the RFA. *See Mid-Tex*, 773 F.3d at 342.

## IV.    CLAIM 10

Defendants argue that plaintiffs' claim 10 must be dismissed as to the NMFS for failure to state a claim under the ESA.[4]  (Mot. at 26-29.)  As discussed above, the Court does not believe that plaintiffs have adequately alleged any injury-in-fact sufficient to confer Article III standing for that claim.  *See supra* Section I.  However, even if plaintiffs had established standing to bring claim 10, the Court concludes that they have not stated a claim under the ESA against NMFS.

As discussed above, the ESA requires that federal agencies consult with the FWS or NMFS before undertaking any action that "may affect" an endangered or threatened species. Consistent with that requirement, the Corps consulted with the NMFS regarding its adoption of the SLOPES IV procedures.  The NMFS then issued a biological opinion finding that use of the procedures would not jeopardize any endangered or threatened species or their critical habitats.

As part of the NMFS consultation requirement, the ESA specifies that agencies must use "the best scientific and commercial data available."  *See* 16 U.S.C. § 1536(a)(2).  Plaintiffs allege that the NMFS failed to consider the 2009 NMFS Guidelines, which, according to plaintiffs, "endorsed the use of treated wood in aquatic environments below a significance level of 50 treated wood pilings," and therefore failed to consider the "best scientific and commercial data available," in violation of both the ESA and APA's rational decision-making requirement. (Compl. ¶¶ 74-78.)

---

[4] Both parties refer to plaintiffs' claims "against NMFS."  (*See, e.g.*, Mot. at 29; Opp'n at 31.) NMFS is not a named defendant in this case.  However, the Secretary of Commerce, Rebecca Blank, who is named as a defendant in her official capacity, has delegated authority for ESA consultation to the NMFS.  *See supra* at 3.  Thus, the Court assumes that these arguments relate to Defendant Blank.

The Court concludes that, even assuming all of plaintiffs' allegations to be true, plaintiffs have not stated a claim under the ESA against NMFS.  The ESA provides that when an agency submits a written request to the NMFS for a biological consultation on a proposed action, the NMFS must then evaluate whether that proposed action would jeopardize any endangered or threatened species or their critical habitats.  Here, the proposed agency action at issue was the adoption of the SLOPES IV procedures, which provided for expedited approval of construction projects that did not use treated wood, among other things.  Thus, the only question the NMFS was charged with answering in its biological opinion was whether those procedures—addressing projects that *did not* use treated wood—would harm any endangered species.  The 2009 NMFS Guidelines on the *use* of treated wood, therefore, had no bearing on the issue.

As defendants correctly point out, plaintiffs' claim 10 is thus more properly construed as an argument that the NMFS should have considered the biological impact of the use of treated wood.  (*See* Mot. at 26-27.)  Unfortunately, the ESA does not require, or even permit, the NMFS to evaluate an action other than the one proposed by the agency.  The NMFS is instructed only to determine "whether *the action*, taken together with cumulative effects, is likely to jeopardize" endangered species.  50 C.F.R. § 402.14(g)(4) (emphasis added); *see also Forest Conservation Council v. Espy*, 835 F. Supp. 1202, 1217 (D. Idaho 1993) ("Nor is NMFS required to develop and evaluate alternatives to the action proposed by the [agency]; it must simply evaluate the *effects of the proposed action* . . . .") (emphasis in original); *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 1998 WL 1988556, at *10 (W.D. Wa. May 29, 1998) ("Under the ESA, NMFS must analyze the action as *proposed* by the proponent agencies.") (emphasis in original).  Nor was the NMFS entitled to alter the proposed action into something more or less restrictive; it is only if the NMFS finds that an action *will*, in fact, jeopardize an endangered species, that it may

identify alternative courses of action that it believes would avoid that jeopardy.  50 C.F.R. § 402.14(h)(3).  The NMFS did not make such a finding in this case; it determined that the SLOPES IV procedures would not jeopardize any endangered species, and therefore it had no occasion to consider the biological impact of the use of treated wood.

Thus, even accepting plaintiffs' allegations as true, they have not stated a claim against the NMFS under the ESA.

## CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss is granted.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   February 27, 2013